your honors. First and foremost there is much argument made in the papers about the criticisms that plaintiff makes as to what the school did leading up to April 17th but if you look at April 17th and specifically I'm referring to the assault you look at all the actions that follow you look at the misconduct of the timing actions and omissions of the athletic department of the lack of advisement from external law enforcement the fact that this was going on during the playoff season of the men's lacrosse team and the individual I'll call him aggressor in this in this case of mr. Scanlon was the leading playoff score the leading scorer sorry and a recruit to the lacrosse team there's a lot to be made just from that just from the acts and omissions following April 17th but when you peel the layer back to January when plaintiff first walked into the Title IX office and when she first even before that reported what was going on with her and mr. Scanlon to her assistant coach it paints a picture where you start looking at this courts jurisprudence and I'll quote it to be disciplinary decisions made by school administrators as said in Davis this court went on to explain in Zeno the right to select among various appropriate remedies is not by itself a shield against liability the appropriate remedy is in question after January when plaintiff came forward and started explaining that she was in a abusive relationship was a no-contact order some outreach to her by personnel from the Syracuse University Title IX office and that was it there was a black what should have happened instead there was a vacuum your honor of any type of remedial measures any type of supportive measures on the side of mr. Scanlon we are not saying that he should have been disciplined immediately we're not saying in terms of protective measures there isn't no contact order right correct your honor is there any evidence in the record is lacking in something that maybe must have happened but is there anything in the record at all to suggest that there was a violation of the no contact order while it was enforced I mean we don't hear anything about any relationship between Doe and Scanlon during that interim period your honor we do in a sense on April 6th when those two teammates go to the deputy athletic director senior woman advisor Kimberly King Kirkpatrick it's a mouthful but I will refer to as Kimberly Kirkpatrick when they go to Miss King Kirkpatrick while the team is traveling back from a game in DC Doe is not on the bus and her two teammates go to Kimberly Kirkpatrick and they explain that they're concerned they're concerned that mr. Scanlon is entering her apartment without permission at night they explain that they're concerned that he's checking her whereabouts and they explain that they're also concerned because they've witnessed some form of violent animal abuse towards their shared pet but all of that is consistent with what we know was going on before January is there any current events your honor that's the argument Syracuse makes an argument it's a question oh yeah is there you know is there is it clear about what is being talked about because the animal abuse and all of this is exactly what she talked about in January it's crucial at this point your honor to remember we're at the motion to dismiss stage and as this court held in Lynch v City of New the answer the answer is no there is right I mean that is that what you're telling me I understand you're going to have an argument about why I shouldn't care about that I get about why the ambiguity but what I want to know is is there anything in the record is it is it apparent is it even I mean is it a reasonable I guess maybe it's a reasonable inference that they're talking about present tense things we think it is your honor because this is how domestic violence works where it's usually not the outcry of a specific complainant it's the friends it's the family members it's other ways so you're suggesting something should have happened on April the 7th I'm suggesting in January title 9 should have started in January she says I don't want any that she's told about all the things that are available and she says I don't want that yes honor she doesn't even say I want the no contact order until she thinks of that and then she says yes right I want the no contact order they put in place the no contact order then she calls and says I want the no contact order rescinded correct and they don't rescind it yes and we go it goes you know from January to March still in place from the University notwithstanding that she has requested that it be lifted correct and even in Syracuse own training materials talking about domestic violence they talk about how it cyclical how it is prone to spiraling in terms of what Syracuse University did not do does the complaint allege that there was any independent investigation that the university conducted with respect to mr. Scanlon that's the problem your honor precisely there is apparently no type of inquiry at all no counseling no communication with mr. Scanlon no one even talks to him we don't even know if the men's coach was informed about this abusive relationship and what was being reported a title the title 9 office and we submit time to the duration between when requests that the no contact order be withdrawn and when it was actually withdrawn is there any allegation at least that there was some inquiry by the school to to ensure itself that there were grounds to withdraw the no contact order or was it just a delay or do we not know we do not know but we think they should have we think at the very least someone should have talked to mr. Scanlon or at the very least when plaintiff started asking for the no contact order to be withdrawn someone should have at least had a more human element and had a phone conversation with her and asked more than two basic questions the way that's what we're alleging yes your honor okay and was there something that the university could have done yes very much so very had a conversation with either one of them in person start exploring well what would do the people around them know because we know that the second that the school wanted to reinstate mr. Scanlon it was his teammates who we submit probably know mr. Scanlon the best they put their foot down and said we are not sharing the field with this person so there there's a lot of information that Syracuse University could have accessed could have inquired upon and would have further been part of the known circumstances to then put them out of the zone of deliberate indifference but our position is that just clarifying questions okay so after there was an intent to potentially transfer to Jacksonville University that didn't go through that did not go through correct correct your honor the enemy part of it was so Joe remained at Syracuse University no so there were two conversations she had with two different members of the athletics department that innocent as that they're the heart of our retaliation claim because at this point there was she had already informed the school in May that she had hired counsel that she was looking into the title 9 situation and then what happened next was in less than a month after that the deputy athletic director senior women's administrator Kimberly can anchor Patrick took up on herself to reach out to plaintiff and had a conversation about she left yeah she left despite wanting to stay despite wanting to play division one the first conversation with Kennecker Patrick was essentially do not leave do not make it even seem like you're gonna burn bridges or leave in a nasty way your scholarship is is gone you say that the the double K that she reached out I thought that your client might look for that meeting yes my client made an inquiry to the interim women's coach asking about the transfer portal she even then it was Kimberly and she wanted to know what will have I go into the transfer portal what happens to my scholarship yes exactly and so there was a meeting then in response to that inquiry and that's the meeting that you're talking about correct there was a phone call where the first question out of Kimberly Kirkpatrick's mouth was is this about Scanlon and then the line of inquiry after that was it's the analogy would be your honor to a mafia person walking in and saying and this is a great business you have here to be ashamed if anything happened to it and the text of that is it's not offensive on its face but the the way a 20 year old college student would interpret that the deputy athletic directors telling her your scholarship may be rescinded even if you stay at Syracuse you may lose your scholarship if it looks like you're leaving in a nasty way or burning bridges immediately told plaintiff that her title line rights which in this case was using an attorney and vindicating her title right nine rights against Syracuse University was going to put her scholarship in jeopardy but regardless of that she still wanted to stay she told new coat the the new coach in July at the beginning of the conversation I want to stay I want to figure out how to overcome these obstacles and I want to make the best of my time is that in the record and that is that in the complaint which party honor the part about what happens in July yes yes with the new coach yes because it's my impression that it sort of cuts off the events at a certain point so that we we hear that Scanlon is in fact arrested right that's that's in the record yes your honor in May and that takes place about is it two weeks after the April 17th incident about yes yeah but and this is one of the things that is sort of interest me how are we to think about some of these things the university does take certain actions and it's my understanding well I think it's outside the record that Scanlon is eventually expelled right yes or after the arrest and and Scanlon is not allowed back on the team now what's interesting to me about this is that though I'm not sure what are we to make about any of those events given that they seem to have been brought about by people other than the university administration in the sense that he gets kicked off the team because his teammates don't want him and threatened to go on strike in effect if he comes back he gets arrested I believe because Ms. Doe's father calls the police not because the university calls the police to be clear Ms. Doe's father calls the police but we're not alleging that that was what led to the to the arrest we think it was the media or we're pleading alright so whether it's her father or the press or the public or outraged students or the school newspaper or the team if things do happen in a relatively timely way that lead to the expulsion of Scanlon and his arrest but those things were not at the instance of the universities are pushed into that by external forces how do we how do we evaluate that is that just like some sort of damages question or they they didn't do what they should have done a week earlier it is it's a very interesting question your honor because it is two deliberate indifference running into each other and so from from a first point I would say with these kind of questions you do not want to resolve on a motion to dismiss you should develop some facts but on the second point the you look at what the school didn't do and you look at what the the rest of the the rest of the conduct of the different parts of the university so the athletics department it seemed they in their brief they say that they did not suspend Scanlon or they withdrew the week-long suspension because of due process concerns but director the effect director while hack tells the parents it doesn't mention anything about due process he says he points the finger at the men's coach and says well he wanted him back on the team and the men's coach even says that in the press conference and so things aren't adding up and we submit that in council is it in the complaint that you mentioned that Joe left the school left the team was that as a result of the events that transpired in 2021 or for for the events in 2021 your honor we discussed in the complaint the concept of institutional betrayal okay so first just is there an allegation in the complaint that Joe left the school and left the team because of what transpired in 2021 is that actually in the complaint yes your honor but it's not in one paragraph it's in different paragraphs but I can happily clarify for that and on that topic of so I guess just to finish the thought yes you said these claims sort of run into each other so the end story is that Joe because of what transpired in 2021 with respect to the school and mr. Scanlon left the team and left left the school is that is that fair yes and I hesitate right there because there was a period of time where despite her fear and despite the despite the fear that she felt from mr. Scanlon and the school and the feeling that she was not going to be protected by the University she came back to the school and and that's in the papers but she came back when she found out that mr. Scanlon was being put back on the team in spite of her fear she realized well why is he being reinstated on the team and this is what motivates her to get back into school and how long does she remain at the school from the summer of 2021 onward does she immediately then leave and doesn't come back for the next semester did she graduate there's this kind of abrupt end to the story in the complaint so I'm trying to figure out what exactly happened after these events in the spring and summer of 2021 the plan for plaintiff was she was hoping to figure out a way to stay at the school and stay on the team after the calls with Kimberly Kinney Kirkpatrick and the new coach as we call it a complaint she left the school and because she's a plaintiff we we can say she's still attending university she's still playing lacrosse but nowhere near at a program as as procedures or as good for your career as a Syracuse and that goes towards how this overall affected her okay I'm not sure I'm answering your question. To the extent that this is not alleged in the complaint that immediately after these events Doe left the school and left the team at least at Syracuse that is something that you could amend and add to the complaint That is correct your honor. I see I'm at nine minutes. Yes, thank you. Good morning and may it please the court Lauren Hartz for Syracuse University. The district court correctly dismissed the complaint for failure to allege a title nine claim. Plaintiffs own allegations what's in the complaint not what you heard from council today plead her out of court because they show that the university's response was prompt and appropriate and in any event not clearly unreasonable. The district court was entitled to make that call at the pleading stage as a supreme court specifically held in Davis and it correctly rejected plaintiffs arguments which would radically expand title nine liability for the thousands of educational institutions within this circuit. I want to go directly to some of the questions that were asked of my friend and tie them very specifically to what is actually in the complaint or what plaintiff plausibly could allege. Now first of all there were some questions about the no contact order. There's no dispute and this is in the complaint that immediately after plaintiff first came to the university they offered a no contact order along with making her aware of all of her procedural rights all options available to her and all supportive measures. When she asked for the no contact order it was immediately imposed and there's no information in the record Judge Lynch that it was ever violated and to your question Judge Subramanian there was an inquiry before it was removed and this is in the complaint and in the materials that are referenced. That's correct your honor. Whether she wanted to that's no contact order in place. That's right so she initiated the process removing the order by filing by filling out a written form which is at the joint appendix at 123 where she said that she felt safe where she said she was aware of the supportive measures available to her and that no further incidents would occur and then there was an additional phone conversation in March months later where she was asked if she felt safe and she confirmed that she was. Well sure but the complaint also alleges that the school did not conduct any independent investigation and did not speak to Mr. Scanlon concerning the events that Doe had reported correct? If you're referring to plaintiff's complaint back in January there was no investigation at that time but there was no requirement on the university to investigate. Well the complaint also alleges that the student handbook says that before a no contact order would be vacated that there would be a determination that there is no evidence to support the reasons why the no contact order was put in place in the first place. That's what the complaint at least alleges. So what do you make of that? So two things there. First of all I think we're using investigation in two different senses. So in January there was no Title IX investigation and we can talk about why that was the case and why the lack of investigation doesn't mean deliberate indifference. But yes the university undertakes an obligation when a student asks to rescind a no contact order to confirm that they felt safe. That's a different type of investigation and that's precisely what occurred when they took into account the information the plaintiff provided. What about specifically what's in the student handbook that says that the and I don't have the language right here but it says that the evidence leading up to the no contact order that there would be a determination that that there is no evidence to support the placement of the no contact order. And that's precisely what the university did. There was no evidence. There had been no evidence of any further contact, no evidence of any violation, and you have plaintiffs saying... How would the school know that if the school did not conduct an independent investigation? Because plaintiff told them that and plaintiff told them that both in writing and when they contacted her via phone. So the requirement of student handbook doesn't suggest that there is a lengthy investigative process that has to take place. It suggests that they can't simply on the say-so of one party remove the directive and they didn't do that here. But I think even more to the point... They did do it on the say-so of Ms. Doe. There's no other evidence involved other than what Ms. Doe said, right? They did that on the say-so of Ms. Doe and the lack of any information from anybody that there had been any further negative incidents between the parties or any contact between them whatsoever. And even if there had been a violation of the handbook, which we certainly deny in this case, that is different than finding deliberate indifference under an applied private right of action for Title IX that's reserved for extreme institutional failures. Now I want to also talk about the... Well, there's a couple of things here that are interesting. One is the phrase deliberate indifference, right? Are you familiar with the case law about deliberate indifference in the context of prisoners' medical care? To some extent, Your Honor, but certainly not as much as Title IX. It's sort of horrible, right? I mean, it has to be like the guards won't take you to the doctor kind of stuff because if the doctor commits malpractice, it's pretty well established that that's not deliberate indifference. The doctor did something. It happened to be terrible, but that's a state law malpractice claim. That's the context in which I am most accustomed to the phrase deliberate indifference. Here, though, we have said that deliberate indifference can be found if there is a plainly unreasonable steps taken, right? Which sounds like something a little different. If what was done was sort of educational malpractice, maybe that could be something that leads to an inference of deliberate indifference. Now, but I take it that there's not a lot of case law, at least binding case law on us, that interprets what exactly that means, what would be an unreasonable response, right? So for binding case law, I would direct the Court to the Supreme Court's decisions in Gebser and Davis, which are very careful to make this an extremely narrow cause of action, again, for extreme institutional failures. And what we need is allegations in this case that the funding recipient itself had actual knowledge of peer harassment and that it was a conscious decision. Well, that's satisfied. That's clearly satisfied, right? That's satisfied with respect to plaintiff's January report and it's satisfied with respect to plaintiff's April report. We can talk about April 6th reports by teammates if you'd like. But, you know, I think stepping back here, it's really important to bear in mind that... Well, it's satisfied for January. We'll take them one at a time. It's satisfied for what we've been talking about, which is the response with the no contact order. Yes. Yes, Your Honor. And so what was then incumbent upon the university was a response that was not clearly unreasonable under Gebser and Davis. And I think one really critical way that this may differ from the analogous circumstance of prisoner rights that you mentioned is, you know, the primary mechanism for enforcing Title IX is to bring a complaint to the Department of Education Office for Civil Rights. That is the enforcement mechanism. This implied private right of action is extremely narrow and it's just for the most serious instances of institutional failure. And the cases that we do have from this circuit and other circuits that have found this type of claim adequately alleged have looked to things like months long delays, half measures, actively sabotaging the complainant. And we have nothing that comes anywhere close to that here. Instead, we have actions that include immediate and prompt outreach, imposition of no contact orders. And then when the university first learned that the situation was continuing and was escalating, we have the university itself launching an investigation even when plaintiff said that she didn't want to pursue one. We're not aware of any case with facts like these where a court has found deliberate indifference. And in fact, the facts here are just on a different planet. Well, you're talking about facts. And of course, we're at the complaint stage. So given that the standard in Davis, which you directed us to, said that the standard is clearly unreasonable in light of all the facts and circumstances, really what the plaintiff is asking for here is simply discovery to determine whether that standard can be satisfied. So given the allegations of the complaint and all the things that we've been talking about today, why isn't there at least a right to discovery here? Because to get to discovery, plaintiff still has to satisfy the Iqbal and Twombly pleading standard. And what plaintiff doesn't allege, even if we credit all of the allegations in our 86-page complaint, is a response that was clearly unreasonable. Well, let's talk about that. So on April 6th, there's this reporting from the two other teammates. And Ms. Keenan Kirkpatrick responds saying, there's nothing you can do when the young lady won't be forthcoming. You don't think that that's at least the starting point for maybe an allegation of deliberate indifference, given that we know that an investigation had not been done by the university, at least as alleged by the complaint prior to the April 17th assault? No, for a couple of reasons. First, I think it's really important to clarify that allegation, which I believe is at paragraph 270 of the complaint. The allegation is not that Ms. Keenan Kirkpatrick responded to the teammates that way. The allegation is that when the university later had its full investigation of Scanlon, which it did, that Ms. Keenan Kirkpatrick testified that. So that wasn't her response to the students at the time. But let me say a few other things about April 6th that I think are important. First of all, to Judge Lynch's questions, I believe, there are no allegations of complaint that the university learned anything additional. And what the complaint says at paragraph 269 is that those two teammates provided details about the allegations that the university had already been aware of since January. So I think that's important. I think it's also important to look how plaintiff has pled this case. And if you look at where the counts are actually listed in the complaint, and this starts at JA 78, there's no claim related to April 6th. The claims in this case are about how the university responded to the report. So on the paragraph 270, so it says, when describing these disclosures, referring to the disclosures made by the teammates that predated the April 18, 2021 assault, Keenan Kirkpatrick commented that there's nothing you can do when the young lady won't be forthcoming. Yes, Your Honor. And you're rereading, left out the keywords, during defendant SU's Title IX investigation. No, I understand that it came out during the investigation. I'm saying that what Ms. Keenan Kirkpatrick was commenting about her response to those disclosures made in April 6th. Is that fair or unfair? I'm not sure if that's fair based on what's actually here, that she's recounting what she said at the time, as opposed to how she's responding to being presented with that information in the investigation. But let's take a step back. What did she do in response to that? In other words, we do know what I think it's the same person did, or maybe it was a different coach, but someone, when the way this whole thing starts in terms of the university's knowledge, is that Ms. Doe talks to a coach. And then the next thing that happens is the Title IX office is on it. So the obvious inference is that that coach that she spoke to passed that on to the Title IX office. There's no such indication about April 6th that there was any, whatever Keenan Kirkpatrick said to the women on the team, there's no indication that she reported what the people on the team passed along. That's right. The complaint doesn't allege one way or another. Because they don't know. They can't allege what she said. There's an absence of any indication that anyone other than this person ever heard about it, because there's an absence of allegations of any further action by the university until after the April 17th incident. But there couldn't be, right? Unless there was action that Ms. Doe became aware of, because she's not privy to what went on. She's also not privy to what went on with the men's coach. One of the things that puzzles me a little bit is, on the one hand, okay, the men's coach wants this guy back on the team. We seem to know that. And the men's coach tries to put him back on the team. And I'm a little puzzled as to what that has to do with anything, his being on the team or not. Unless, which I'm not sure there's any allegation of, the men's and women's teams travel together or something like that. On the other hand, if I was taking discovery, I would really like to see what, if any, communications there were between the Title IX people or other higher-ups at the university and the men's coach. What's accounting for the choices that they're making? If the men's coach is somehow implicated in what decisions are made with respect to protective measures, that would be very interesting to know. But of course, Ms. Doe has no way of knowing that absent discovery. Judge Lynch, I think the key issue is that for both time periods you just covered, I'd like to address both of them. The April time period and later, after the assault that took place in mid-April. The information that you're referring to wouldn't make a difference under the deliberate indifference standard. In April, we don't know what Ms. Keenan Kirkpatrick did with the information because it's not alleged, but she was not an appropriate person. That is the key inquiry under Gebser and Davis. Her information and her reaction cannot be charged to the university in this context where the Supreme Court has been very careful to say, we have no vicarious liability. We're looking specifically at the person who is responsible for Syracuse University to institute corrective measures. There are no allegations that Ms. Keenan Kirkpatrick was that person. Now, if we fast forward to what happened- Internally at Syracuse, to start with, that professors, teachers, coaches report allegations to responsible officials who are charged with enforcing Title IX obligations? There is, Your Honor, but there's a difference between that and what we're talking about that is very important. So, of course, Syracuse has 5,000 employees and many of them are mandatory reporters. They have to bring that information forward. If they fail to do so, that may be a violation of Title IX regs and plaintiff can go to the Department of Education and file a complaint with the Office of Civil Rights. But what we're talking about here for deliberate indifference is we are looking at the knowledge or notice of the appropriate person. That is the language that Gebser and Davis use and asking what they knew or had notice of and what their response was. And Ms. Keenan Kirkpatrick, yes, as a Title IX liaison, needed to bring information forward, but whether she did so or not and what her actions were are not relevant to liability for this specific deliberate indifference claim. And there are good reasons for that. As a policy matter, we want as many people as possible being eyes and ears of the university and bringing information forward. But if any of their failure to report that or failure to act could ground a deliberate indifference claim, that would dramatically expand liability. Who do you think is, where does that liability start in your view? President of the university or the person in the Title IX office? So the language that Gebser and Davis use is the person or people with authority to address discrimination and issue corrective measures on the institution's behalf at a minimum. So the Title IX office can do that? Title IX coordinator certainly. So there's no question that the person that Ms. Doe spoke to in January was not the coach in the first instance, but the person who follows up on what she tells the coach. That person is a responsible person. Absolutely, Your Honor. And same with respect to the complaint that, the information that she brought forward as a result of the April 17th and 18th events. But if we're looking at April 6th, that person was not an appropriate person. Even though she was a Title IX liaison as alleged in the complaint. So she's literally the liaison in the athletics or a liaison in the athletics department to the Title IX office. There's not even a factual question whether under these circumstances, if we had discovery, it could be shown that Ms. Keenan Kirkpatrick was an appropriate person. Or perhaps that she had reported it up the chain. No, Your Honor. Again, it wouldn't make a difference whether she reported up the chain or not for the reasons that I discussed with Judge Lynch. But I think that the key issue here is that all that's alleged is the title. But thousands of employees are Title IX liaisons in the sense that they need to bring information forward. There's nothing alleged here like there is, for example, in the Brown case that plaintiff recently submitted a supplemental authority. Where at that institution, the Title IX liaison, based on facts that were alleged and then were shown, was actively involved in instituting corrective measures. We don't have that here. And so she just doesn't satisfy the appropriate person standard. But I want to go back for one moment to what it is that happened and who was pushing things forward after the events of April 17th and 18th. Because there have been some comments to the effect that, well, anything that happened or transpired was really a result of external factors, as opposed to what the university did. And that is simply not a plausible reading, even of what is alleged in the complaint. Because what's alleged in the complaint is that the university responded to the scene, immediately issued a no-contact directive, immediately made supportive measures available to plaintiff. And after having many conversations with her about moving forward with her own complaint, when she declined to do so, moving forward themselves through that process. Whether Scanlon, for that time period, was on the team or off the team, I would submit is simply irrelevant. Because this is not a case like Grabowski, the other supplemental authority that plaintiffs submitted this week, where the students were on the same team. And so keeping a student on the squad, as opposed to removing them, would expose the complainant to further discrimination. What about the discussion with Mr. Nugent in the general counsel's office, where some concerns are raised to him. And he says, well, you know, Mr. Scanlon, referring to Mr. Scanlon, he's not going to get arrested. And when there was a question about the safety issues, Mr. Nugent is alleged to have said, well, since Doe was then at home with her parents, there was no further safety issue, at least during that time period. Is that not relevant here? And why doesn't that at least suggest that there was some deliberate indifference? Well, because there's no dispute that the local law enforcement authorities were made, within days, aware of these issues. And in fact, issued an order of protection and arrested Mr. Scanlon. And so I think that those allegations simply wouldn't make a difference one way or the other. If it turned out in the evidence that the reason why Mr. Nugent said he's not getting arrested is not because there was not a safety concern, but really because Mr. Scanlon was a superstar lacrosse player, wouldn't that support an allegation of deliberate indifference in these circumstances? No, because what we're looking for is not the intent of the institution or certain individuals at the institution, but what the institution knew and how the institution responded. And I think critically... Mr. Nugent would have been an appropriate person, given that he was in the general counsel's office. I think he was an associate general counsel, or is there a question as to whether he would be an appropriate person? I'm not aware of any law addressing that. I think that there might be a question as to that. But again, I think we need to look at the fact that there is no dispute that he was arrested, that he was later removed from the institution and from the team. And I think a really important point... There's nothing in the record that says that the university ever contacted the Syracuse Police Department. Is that right? The complaint doesn't allege that one way or another, but it does... Of course, that's something that they could not know. I'm not sure it's right that plaintiff couldn't know who contacted the police,  Well, she knows that her father contacted the police. So that's a fact. That doesn't mean that Syracuse didn't. But I'm not sure how she would know. And after all, her family is told he's not going to be arrested. I'm not sure what that is based on. But it certainly does not imply... Maybe Mr. Nugent personally called the Syracuse Police Department and the Syracuse policeman said, we don't care about that. That could have happened. I don't know. But it's the opinion, anyway, of somebody high up in the Syracuse University administration that the man is not going to be arrested when there is a protocol in place that domestic violence is supposed to be reported between Syracuse University and Syracuse PD, that this kind of thing is supposed to be told to the police. So let me add one point beyond what we've already discussed, which, of course, includes the fact that he was, in fact, arrested within days. And that is that the university's actions that are allegedly deliberately indifferent have to subject the complainant to further harassment. There are no allegations here that in the few days that passed between the events of April 17th and 18th, and when the police were indisputably identified, that plaintiffs suffered any further harassment during that time period. There are no allegations that there was further contact between the parties or interactions of any kind. And indeed, a no-contact directive was in place the entire time. So what plaintiff is essentially asking you to hold is that a, quote unquote, delay of less than two weeks for police to be notified constitutes a deliberate indifference. And there's no basis for that whatsoever. Courts have looked at delays significantly longer than that and found no deliberate indifference. And I think what's critical here is during that alleged delay period, the university was moving forward. They were meeting with plaintiff. They were meeting with her parents. They were advising her about her rights, about supportive measures. They were encouraging her to sign a complaint. And then when she declined to do so, they were signing their own complaint. So in this context, it's not deliberate indifference. And if plaintiff were to say that it were, plaintiff cannot show how it is that the university's actions were subjecting plaintiff to further harassment during that period of time. To a risk of further harassment. Isn't that the point? It's not. It doesn't have to actually be evidence that there was further harassment. I'm sorry, Judge Lynch, I missed the beginning of your question. To a risk of further harassment. In other words, if they didn't institute a no-contact order and they did absolutely nothing, even if, thank God, nothing further happened, wouldn't that still be a situation in which the failure to take any actions at all exposed the plaintiff to a risk of further harassment? That's, isn't that, I thought that was.  Which say the university actions need to subject her to further harassment. But even if you accept that the standard is a risk of further harassment. Well, see, what I'm concerned about is if the reason that she was not subject to further harassment is because she absented herself from the campus out of fear, thus missing out on going to class, going to practice, playing on the team, doing whatever her normal activities would be. It seems to lie ill in the mouth of the university to say, well, see, nothing bad happened to her at the hands of Mr. Scanlon. Something bad happened to her if the only way that she can protect herself is by leaving the campus and abandoning her education and her activities. That would be problematic, but that's absolutely not what we are seeing. Plaintiff was, of course, free to leave campus and go home if that is where she felt that she needed to be. But it is critical that there were DPS officers on the scene. We issued a no-contact directive. We offered safety escorts. We offered to change her housing. We did all of those things. And so I think it's disingenuous for Plaintiff to say, well, I left and I had to leave. I had no other choice for my safety. Those are all actions we were taking. During that two-week period, Mr. Scanlon remained on campus. He was, in fact, reinstated onto the team, correct? That's right. And I think that... So I think that the allegation, at least, is that in a situation where you had this serious assault that occurred on April 17th and Doe felt that due to safety concerns, she needed to be home because Mr. Scanlon remained on campus, why doesn't that at least give rise to a claim for deliberate indifference? Because we're using an objective standard. And the fact that she wanted to be home when the university offered everything... It's not that she wanted to be home. It's that the university didn't remove Mr. Scanlon. So the university wasn't... I think it's critical. The university, when a complaint is brought forward, has obligations to both parties. If it had removed Mr. Scanlon without the adjudicative process that is owed to him under Title IX regulations, it would have liability to him. And it can't be the case that a university has to choose between liability to one side or the other. Isn't that the kind of inquiry that we would engage in after discovery on summary judgment when we have a full record of what the school exactly did behind the scenes and why, as opposed to on the face of the complaint? Because at least the complaint says that shortly after when Ms. Doe was at home and not at the school, there was an inquiry with Mr. Nugent. And he just said, well, since you're home, there's not a safety issue. So it's okay that Mr. Scanlon is on campus. And, you know, he's not going to get arrested. That's at least what happens, I believe, on April 25th when that conversation occurs. So I think it's important to be very clear about what it is that happened. So the information was brought forward to the university following the April 17th and 18th events. Mr. Scanlon was then temporarily suspended, which gave the university time to conduct a threat assessment. This is all alleged in the complaint. Once that threat assessment was complete, the university was not free to keep him away from campus or to keep him away from his team because those are disciplinary actions that can only take place after a full investigation. And the university was chomping at the bit to conduct that investigation, but waiting for plaintiff to say if she wanted to go forward or not. Once she said she didn't want to, the university moved forward, and that's a process that then played out, although the allegations are notably absent from the complaint. So the explanations that you just provided, those would be the kinds of arguments that you would make on a factual record after discovery, right? Because you would put in that evidence showing that the university was chomping at the bit to... Yeah, the complaint doesn't have any allegation that the university was chomping at the bit. I think that's fair to say. Fair enough. I'm sure that that's not how plaintiff or her counsel would characterize it. But what the university does show is that there was a series of meetings over a one-week period where the university was repeatedly advising plaintiff of her rights, and that as soon as she said she wasn't moving forward, the next day they issued a notice of investigation. So yes, chomping at the bit is my characterization, but looking at what is alleged in the complaint shows the university was moving forward swiftly, and nothing that I said to you, Judge Supermeeting, is a fact issue. We kept you a very long time, but can I just try and summarize? I think I understand your position, and it runs something like this. The standard is deliberate indifference. We are not to second-guess whether what they did was best practices or ideal or even very good. You might say it is very good, but you're not asking us to evaluate or saying we shouldn't evaluate that. That when they got this report in January, they took steps, and those steps were not manifestly grossly unreasonable. When the further incident happens in April, they again take steps. They take a lot of steps. They may not rush to call the police. They may not rush to suspend Scanlon or expel Scanlon or do anything else, but they do a variety of things, and since they're doing a variety of things, we're not supposed to second-guess what exactly they did so long as it's clear that they're taking this seriously and engaged with the process. Is that fair? Yes, Your Honor. I think that's precisely what cases like Gebser and Davis say, and there's been a lot of question here about whether we should allow discovery, and I would direct the court to the cases we cite on page 24 of our brief, cases like Bailey and KF, XREL, CF. These are cases that were decided on a motion to dismiss, consistent with Davis having said that clear unreasonableness is not sort of the typical reasonable standard that might require factual issues who worked out a summary judgment. It is a low standard for the defendant that can be resolved at a motion to dismiss, and that's precisely what we are asking the court to do here. If there are no further questions, we would ask this court to affirm. Thank you. Thank you, counsel. Mr. Allen, you have three minutes. Thank you, Your Honor. While it's covered, I'll endeavor to be quick and thorough. We just heard a lot from my friend about how the school was chomping at the bit or getting ready to investigate Mr. Scanlon. I think the words were next day, and that is true in the pleadings. The very next day after a plaintiff told the university that she did not want to go forward with a formal complaint under Title IX parlance, the school did go forward. But that precisely underscores why this was deliberate indifference. The school was ready to go forward, and they, for some reason, right after the assault at the first meeting of the Title IX office and back in January, for some reason, the school, the university, and the Title IX office, who should have been trained on domestic violence and the dynamic with complainants, does not mention to the complainant that there is an option for the school to independently pursue- Why should that be mentioned to her? I mean, I think it's relevant, and it's a good point for you, that they have this power, and they chose not to do that. They chose not to make an independent investigation. But the whole point is, that's on them, that's their decision, that if they told her, we can go forward on our own, but she's saying, I don't want that. How is that helpful to anyone? How is that an important thing to do? To tell her that you have no power here, in effect. We think, at the very least, Your Honor, it provides an ambiguity that should go towards the plaintiff. But in April, the response from the school was immediate, but three different sets of employees apologized for how the campus security arrived to the scene, and put plaintiff and her roommate in danger, which ties to another point that was covered about this threat assessment that Deputy General Counsel Nguyet talked about. That threat assessment considered that since plaintiff was off campus for fear, he was no longer a threat to her. But under Title IX, Syracuse University has an obligation towards all the students, and her roommate, who was so afraid of how the campus police handled the investigation by pretty much explaining to Mr. Scanlon, look, there's people cooperating and talking to the police about you, against you. She had to get a no contact order, and she was still on campus. But the threat assessment, apparently, was still okay with Mr. Scanlon getting back on the team. So we don't know what was part of that threat assessment. And it goes to another point of Title IX jurisprudence, which is that it's a formulation, your honors, that I think is important that this court has started adopting in Zeno, that responses that are not reasonably calculated to end harassment are inadequate. And Zeno cites Zantz and, I'm sorry, Vance from the Sixth Circuit, and Vance cites Murrell from the Tenth Circuit. And Vance states that where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school has actual knowledge that its efforts to remediate are ineffective, and it continues to use the same methods to no avail, such district has failed to act reasonably in light of the known circumstances. So what that means is that since January, the university was accumulating information about Mr. Scanlon, about the complainant. And when campus police show up in opposition, they put her in danger, and they abandon her. They give her a no contact order. They give her a domestic violence flyer saying, you're on alert that you're a domestic violence victim. They don't stay by her apartment. And she has to, her mom shows up, takes her home. And then we get into this week delay. And we were talking about that there is other case law. And usually, yes, there's months and months of delay. But it's not just delay. It's delay and what the school does during the delay, and if there's prejudice to the plaintiff, as explained in our briefs. And we submit that, number one, the delay would have been a lot longer if it hadn't been for Mr. Scanlon's teammates. But number two, from that very same day when, as mentioned, campus police showed up immediately on Sunday to interview the plaintiff and her roommate, at that point, Syracuse University knew that this was a domestic violence situation. Yet, for a week, despite the memorandum of understanding that Syracuse has, we have nothing in the record that the local Onondaga District Attorney's Office was involved, nothing in the record that Syracuse Police Department was involved, despite multiple provisions in the memorandum of understanding that state, if there's an arrest made by relating to domestic violence, you have to notify us. If there's an investigation around domestic violence, you have to cooperate with us. And again, this is not, we're not asking the courts to insert themselves and start telling the school how to run its affairs. Syracuse University decided to sign this memorandum of understanding. They're the ones who, in their policy, said they were going to take domestic violence seriously. A quick point about the appropriate persons and Kimberly Kinneker-Patrick, nearly all the case law cited on both sides of this issue in the briefing is at the summary judgment stage. And specifically, Brown v. Arizona underscores why discovery isn't crucial here. The reasoning behind Brown v. Arizona and how they look at a person with almost the same title in that case was that they looked at not only her title and that she had a reporting function, as we allege here, but also that she did things to correct the conduct. She employed corrective measures. We're never going to get to that point in this case if we do not go into discovery. That case was decided on summary judgment. Case after case, including the dissent in some of the cases that my friend cites, understate that fact, that this is a fact-intensive inquiry. Gebzer, that articulated the appropriate person standard, was employee on student. And the corrective measures that one can take on an employee is very different. And there's even an article that we cite that perhaps the appropriate person standard does not make sense when it's peer-on-peer versus employee-on-peer. I'm almost at my time. I just want to make one quick note about the no-contact order. We remind the court to look at Persaud in our comparison of how domestic violence was treated by George Washington University in that case, which we submit was a lot more responsible. And there was a lot less of a threat of physical violence, because in that case, the no-contact order, the first one, it's an extensive record, but the first no-contact order was issued by the school when there were only electronic communications, and when the aggressor and the complainant in that case were literally on two different continents. They were studying abroad in different semesters. And still, the school said, we know you want to withdraw it, but let's wait until we have an in-person conversation. The last thing I'll note, Your Honors, we were asked about amendments. And we would say that if our first position here is that this court should remand and reinstate all the Title IX claims. We believe our complaint adequately shows and pleads enough facts for all three of the Title IX claims brought, argued here, including actually four, because of the hostile environment claim. But if we were, if this court disagrees and believes we need to amend, we would also add additional details regarding the retaliation issue. As was mentioned in the briefing, it is a question about how the transfer portal policy looks at scholarships. And Syracuse defends itself by saying, well, that's the policy, is that if you enter the transfer portal, you may lose your scholarship. But we would amend to add that the de facto policy for the women's lacrosse team under this coach was not actually that you may lose your scholarship. That coach was very open to his players, wanted them to- Isn't that already in your complaint? I thought it was in the complaint that what Ms. Doe was told, even, was we have a policy that you would lose your scholarship, but we don't really do that unless you're the kind of person who burns your bridges. Correct. And even narrow- And that's where you're suggesting there's a threat of, whether you count that as retaliation or not, you're suggesting that's at least a threat of retaliation. That if you act up, call the police, bring in lawyers, sue us, make a lot of trouble, don't expect to have your scholarship. Exactly, Your Honor. But Syracuse argues, well, that's just the policy. No matter what you do, if you enter the transfer portal, you may end up losing your scholarship. And what we would amend to add is that the policy, de facto policy for the women's lacrosse team was that the coach wanted his players to have their options. Not all coaches are like this across collegiate sports. He was open to his players entering the transfer portal, and it was understood amongst the team that there was no- He wasn't the coach anymore by the time this conversation takes place, right? He'd become the men's coach around that time. Exactly, but what this would add to the complaint is- Okay, I see what you're saying, but basically, it's already in the complaint that the nominal policy was one thing, but at least she was told by a responsible person that the actual policy is probably you don't lose your scholarship unless you act poorly in your departure or what you say about us and so on. That's what it says in the complaint, right? Yes, Your Honor, and what we're saying is just that it was individualized to her. This wasn't even a possibility for other women on her team if they entered the transfer portal. Additionally, we would add that we would flesh out the fact that the men's and women's lacrosse players would share the same practice spaces, share the same lifting spaces. Therefore, the school was knowing that there was an increased probability that these two individuals would run into each other on campus, still only use the phone call, only ask two questions, the bare minimum as we argue in our briefing. Additionally, we would add that in the springtime, as Your Honor asked, there were incidences involving Mr. Scanlon. It's mentioned in the complaint already, but now we would add a time frame to it, an incident where he used the lacrosse helmet and assaulted one of his teammates and there were no consequences from the team. We would amend to add the fact that this was actually in the spring of 2021 leading up to the April assault. We would also include details about the fact that in January, complaint also disclosed that Mr. Scanlon had a alcohol problem and that he would get violent when drinking and we think that would have affected. Yeah, there are a variety of things that are in notes of Ms. Kalaparovsky that you have taken the position we should not read. But you're saying you could take some of that stuff and put it into the complaint now and we should consider that for purposes of amendment? Well, yes, Your Honor, because at the pleading stage... There's some stuff in those notes that I would have thought would be helpful to you, but you're asking us not to pay any attention to that at this stage of the litigation and I understand because it could cut both ways, but that's your position is that we should not look at that material or take it into account. Yes, Your Honor, because our position and I don't want to take up too much time, but it's in the motion to strike in the lower courts. I understand. I know the rules perfectly and I think you're entitled to take that position, but it sounds to me like you're now saying we have a good faith basis to amend the complaint to include certain things that we've kind of kept out of the record up to now. Yes. About the details of exactly what Ms. Doe said in that conversation in January, but possibly in a follow-up conversation that may be omitted from the complaint. Because that's another thing that's rather ambiguous about those records and that's a good reason why we shouldn't pay attention to them. But I'm having a little trouble with the idea that now you're going to tell us a bunch of other stuff that you could amend the complaint to say in light of the fact that, you know, there are things that are in the record but are not considerable by us on the motion to dismiss that the university brought. We understand that, Your Honor, and that underscores the reason why amendments should be made is all the cases that defense uses to argue that plaintiffs should not be allowed to amend. Those are contract disputes, commercial disputes, disputes about arbitration clauses. This is a Title IX case where the plaintiff herself is still anonymous. She and other witnesses are still at the university or other universities. Plaintiff is really caught in a box where at the pleading stage it's very tricky to decide how much to plead. We would also add to amend that information about the phone calls that we described in the complaint as retaliatory, and we are alleging very much are. We would add that there were observations that plaintiff made specifically addressing what is argued in Syracuse's papers, which is that this was a subjectively unreasonable interpretation of the conversations. This is the first time you've raised these points, right? Ten minutes over rebuttal time and oral argument, the proposed amendments you're listing right now. Some of these points, yes, Your Honor. Yes. And there's also the, so yes, we would add her reactions to some of these phone calls that she was crying after the call with the new coach because that's when she realized that the school really did not want her back on the team. And the last thing I'll say, Your Honor, is just for, just because it was brought up on opposition, is this no further harm requirement. I think as Judge Lynch mentioned, the standard under Davis is that deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it. And the opinion, the Supreme Court's opinion, is very precise and cites dictionary language, and that's what we argue in our complaint, is that Syracuse's actions after the April assault did leave her very vulnerable to further harassment. Thank you, Your Honors. We ask you to reinstate the title nine claims, and if not, then please allow plaintiff a chance to amend. Thank you. Thank you, counsel. Thank you both. I'll take the case under advisement.